IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 08–cv–00487–WYD–KMT


DERRICK L. ARANDA, #99396,

      Plaintiff,

v.

L.T. MCCORMAC,
L.T. STRODE,
SGT. P. ADERSON, and
LENORD VIGIL,

      Defendants.

---

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

---

**Magistrate Judge Kathleen M. Tafoya**

      This case involves claims that Defendants violated Plaintiff's Eighth Amendment rights. This matter is before the court on Defendants' "Motion for Summary Judgment" (Doc. No. 107, filed December 21, 2009) and Plaintiff's "Dispositive Motion" (Doc. No. 114, filed January 6, 2010). Jurisdiction is premised upon 42 U.S.C. § 1983 (2008).

## STATEMENT OF THE CASE

      The following facts are taken from Plaintiff's original Complaint, Amended Prisoner Complaint, the parties' submissions with respect to this Recommendation, and various other documents filed in this case. At the time Plaintiff filed his Complaint, he was an inmate at the

Colorado State Penitentiary ("CSP"), Colorado Department of Corrections ("CDOC").[1]  (Am. Prisoner Compl. at 2 [hereinafter "Am. Compl."] [filed June 11, 2008].)  Plaintiff names as defendants Lieutenant M. McCormac, Lieutenant Strode, Sergeant P. Aderson[2], and Lenord Vigil, all employees of the CDOC.  (*Id.* at 1–3.)  At some point Plaintiff was an inmate in the CDOC and granted parole but was incarcerated again due to a revocation complaint.  (Compl. at 16 [hereinafter "Doc. No. 3"].)  It appears Plaintiff was charged and pled guilty to one charge of "Robbery/Agg-Menace victim w/deadly weapon" that occurred on June 13, 2005.  (*Id.* at 15.)  On March 17, 2006, Plaintiff was sentenced to twenty-five years in the CDOC.  (*Id.*)  On July 12, 2006, the state sentencing court recommended placement in an out-of-state facility because of danger to him as elaborated *infra*.  (*Id.*)  Plaintiff states he was placed at the Buena Vista Correctional Facility ("BVCF") on August 8, 2006.  (Am. Compl. at 5.)

From the time of Plaintiff's arrest in 2005 on robbery charges until approximately July 2007, Plaintiff cooperated with the Adams County Sheriff's Office in providing information on attempted robbery at a motel in Adams County.  (Doc. No. 3 at 30.)  With the information provided by Plaintiff, two GKI (Gallant Knights Insane) gang members were arrested for the attempted murder and robbery of the hotel clerk.  (*Id.*)  Plaintiff testified in the criminal trials

---

[1]On March 2, 2010, Plaintiff was moved to the Oregon Department of Corrections ("ODOC").  (Doc. No. 147, ¶ 1.)

[2]Plaintiff misspells Defendant Anderson's name as "Aderson" and Defendant Vigil's name as "Lenord."  Hereinafter the court will refer to these defendants with the correct spellings of "Anderson" and "Leonard Vigil."

against the two known gang members in approximately mid- to late-2007. (*Id.* at 32; Am. Compl. at 3.)

In spite of the state sentencing court's recommendation and the known danger to Plaintiff, upon his arrival at BVCF, obviously an in-state facility, he was placed in the Admission and Orientation ("A/O") Unit before being allowed into a general population unit. (Doc. No. 3 at 24.) On August 14, 2006, six days after his arrival at BVCF and while Plaintiff was still in the A/O Unit, it is undisputed that Plaintiff was assaulted by his cellmate, a GKI gang member. (Am. Compl. at 4–7; Doc. No. 3 at 24.) Plaintiff states he suffered injuries that needed medical attention. (*Id.* at 4.) Plaintiff contends that Defendants "have a duty to review records in their custody when determining how to house a prisoner." (*Id.*) He alleges the Defendants failed to look into ways to protect him and that their failure constitutes a violation of his Eighth and Fourteenth Amendment rights. (*Id.*) He also alleges Defendants have "failed to supervise." (*Id.*) Plaintiff seeks compensatory damages, punitive damages, injunctive relief, and declaratory relief. (*Id.* at 11.)

## PROCEDURAL HISTORY

Plaintiff filed his original complaint on March 10, 2008. (Doc. No. 3.) On May 13, 2008, Magistrate Judge Boyd N. Boland ordered the plaintiff to file a legible, amended complaint that complied with the pleading requirements of Rule 8 and that asserted each defendant's personal participation in the asserted Eighth Amendment violations. (Doc. No. 9.) Plaintiff filed his Amended Prisoner Complaint on June 11, 2008. (Am. Compl.) Defendants filed their motion to dismiss on February 2, 2009. (Doc. No. 31.) On May 26, 2009, this court

3

recommended that Defendants' motion to dismiss be denied. (Doc. No. 48.) The District Court affirmed and adopted that Recommendation on June 18, 2009. (Doc. No. 54.)

Defendants filed their "Motion for Summary Judgment" on December 21, 2009. (Defs.' Mot. Summ. J. [hereinafter "Defs.' Mot."].) Plaintiff filed his response on January 22, 2010. (Pl.'s Resp. to Defs.' Mot. Summ. J. [hereinafter "Pl.'s Resp."].) Defendants filed their reply on February 5, 2010. (Defs.' Reply in Supp. of Their Mot. Summ. J. [hereinafter "Defs.' Reply"].)

Plaintiff filed his "Dispositive Motion" (hereinafter "Pl.'s Mot. Summ. J.") on January 6, 2010. Defendants filed their response on February 17, 2010. (Defs.' Resp. to Pl.'s Dispositive Motion [hereinafter "Defs.' Resp. to Pl.'s Mot. Summ. J."].) Plaintiff filed his reply on May 3, 2010. (Pl.'s Resp. to Defs.' Resp. to Pl.'s Dispositive Mot. [hereinafter "Pl.'s Reply].) These motions are is ripe for review and recommendation.

## STANDARD OF REVIEW

*1.* **Pro Se** *Plaintiff*

Plaintiff is proceeding *pro se*. The court, therefore, "review[s] his pleadings and other papers liberally and hold[s] them to a less stringent standard than those drafted by attorneys." *Trackwell v. United States*, 472 F.3d 1242, 1243 (10th Cir. 2007) (citations omitted). *See also Haines v. Kerner*, 404 U.S. 519, 520-21 (1972) (holding allegations of a *pro se* complaint "to less stringent standards than formal pleadings drafted by lawyers"). However, a *pro se* litigant's "conclusory allegations without supporting factual averments are insufficient to state a claim on which relief can be based." *Hall v. Bellmon,* 935 F.2d 1106, 1110 (10th Cir. 1991). A court may not assume that a plaintiff can prove facts that have not been alleged, or that a defendant has

violated laws in ways that a plaintiff has not alleged. *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983). *See also Whitney v. New Mexico*, 113 F.3d 1170, 1173–74 (10th Cir. 1997) (court may not "supply additional factual allegations to round out a plaintiff's complaint"); *Drake v. City of Fort Collins*, 927 F.2d 1156, 1159 (10th Cir. 1991) (the court may not "construct arguments or theories for the plaintiff in the absence of any discussion of those issues"). The plaintiff's *pro se* status does not entitle him to application of different rules. *See Montoya v. Chao*, 296 F.3d 952, 957 (10th Cir. 2002).

## 2.     *Summary Judgment Standard*

Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works, Inc. v. City & County of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994) (citing *Celotex*, 477 U.S. at 325). The nonmoving party may not rest solely on the allegations in the pleadings, but must instead designate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324; *see also* Fed. R. Civ. P. 56(e)(2). A disputed fact is "material" if it might affect the outcome of the suit under the governing law; the dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict

5

for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

When ruling on a motion for summary judgment, a court may consider only admissible evidence. *See Johnson v. Weld County, Colo.*, 594 F.3d 1202, 1209-10 (10th Cir. 2010). The factual record and reasonable inferences therefrom are viewed in the light most favorable to the party opposing summary judgment. *Concrete Works*, 36 F.3d at 1517. Moreover, because Plaintiff is proceeding *pro se*, the court, "review[s] his pleadings and other papers liberally and hold[s] them to a less stringent standard than those drafted by attorneys." *Trackwell v. United States*, 472 F.3d 1242, 1243 (10th Cir. 2007) (citations omitted); *see also Haines v. Kerner*, 404 U.S. 519, 520-21 (1972) (holding allegations of a *pro se* complaint "to less stringent standards than formal pleadings drafted by lawyers"). At the summary judgment stage of litigation, a plaintiff's version of the facts must find support in the record. *Thomson v. Salt Lake County*, 584 F.3d 1304, 1312 (10th Cir. 2009). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Thomson*, 584 F.3d at 1312.

## ANALYSIS

### 1.    *Claims for Injunctive and Declaratory Relief*

Plaintiff seeks "declaratory relief that Mr. Aranda's rights were indeed violated." (Am. Compl. at 11.) Plaintiff also seeks to "[e]njoin the defendants to cease their current inattention to the grave danger Mr. Aranda faces from the G.K.I. gang as a collective whole . . .", to "[e]njoin

the defendants to take resonable [sic] messures [sic] to ensure [Plaintiff's] safety and not housed

with known G.K.I. members", and to "[e]njoin the defendants to transfer the plaintiff out of state

to another D.O.C. facility." (*Id.*) Plaintiff was moved from CDOC to the Oregon Department of

Corrections ("ODOC") on March 2, 2010. (*See* Doc. No. 147.) Plaintiff's transfer from the

CDOC renders his claims for declaratory and injunctive relief moot. *See Green v. Branson*, 108

F.3d 1296, 1300 (10th Cir. 1997) (prisoner's transfer mooted his claim for declaratory and

injunctive relief as a judgment in the prisoner's favor "would amount to nothing more than a

declaration that he was wronged, and would have no effect on the defendants' behavior towards

him"). Therefore, it is recommended that Plaintiff's claims for declaratory relief and injunctive

relief be dismissed on grounds of mootness. *See McClendon v. City of Albuquerque*, 100 F.3d

863, 867 (10th Cir. 1996) ("Because mootness is a matter of jurisdiction, a court may raise the

issue *sua sponte*.").

## 2.     *Eleventh Amendment Immunity*

Plaintiff's Complaint does not designate the capacity in which each defendant is being

sued. However, given this Court's mandate to construe *pro se* pleadings less stringently than

those drafted by attorneys, *Trackwell*, 472 F.3d at 1243, the Court construes the Complaint as

asserting claims against all defendants in their individual and official capacities. *See Pride v.

Does*, 997 F.2d 712, 715 (10th Cir. 1993) ("where the complaint fails to specify the capacity in

which the government official is sued, we look to the substance of the pleadings and the course

of the proceedings in order to determine whether the suit is for individual or official liability");

*Fenner v. Suthers*, 194 F. Supp. 2d 1146, 1149 (D. Colo. 2002) ("plaintiff's complaint here seeks

injunctive relief and is thus readily construed as a suit against defendants in their official capacities").

Defendants have not raised the defense of Eleventh Amendment immunity to Plaintiff's claims against Defendants their official capacities. However, "a court may raise the issue of Eleventh-Amendment immunity *sua sponte* . . . ." *United States ex rel. Burlbaw v. Orenduff,* 548 F.3d 931, 952 (10th Cir. 2008) (citing *Wisc. Dep't of Corr. v. Schacht,* 524 U.S. 381, 389 (1998); *Nelson v. Geringer*, 295 F.3d 1082, 1098 n.16 (10th Cir. 2002)). It is well-established that "the Eleventh Amendment precludes a federal court from assessing damages against state officials sued in their official capacities because such suits are in essence suits against the state." *Hunt v. Bennett*, 17 F.3d 1263, 1267 (10th Cir. 1994). Plaintiff's claims for monetary relief against the defendants in their official capacities constitute claims against the Colorado Department of Corrections. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) ("a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office"). Therefore, Plaintiff's official-capacity claims for monetary relief against the defendants are barred by the Eleventh Amendment. *See id.*; *Bennett*, 17 F.3d at 1267.[3]

---

[3]The Supreme Court has recognized an exception to Eleventh Amendment immunity for actions where a plaintiff is seeking prospective enforcement of federal rights. *See Ex Parte Young*, 209 U.S. 123, 159–60 (1908); *Hunt v. Colo. Dept. of Corr.*, 271 F. App'x 778 (10th Cir. 2008). The *Ex Parte Young* exception applies in cases when a plaintiff seeks only declaratory and/or prospective injunctive relief and has alleged an ongoing violation of federal law by state officials acting in their official capacities. *See Tarrant Reg'l Water Dist. v. Sevenoaks*, 545 F.3d 906, 911 (10th Cir. 2008). However, the *Ex Parte Young* exception does not apply here, where the court has recommended that Plaintiff's claims for declaratory and injunctive relief are

### 3.      *Motions for Summary Judgment*

Defendants seek summary judgment on the bases that (1) Plaintiff has failed to state a claim upon which relief can be granted due to lack of personal participation by each of the individual defendants; (2) Plaintiff's Eighth Amendment claims fail; and (3) Defendants are entitled to qualified immunity.  (Defs.' Mot. Summ. J. at 11–20.)  Plaintiff seeks summary judgment based on the allegations set forth in his amended complaint and documents submitted in support of his motion.  (*See* Pl.'s Mot. Summ. J.)  Plaintiff's arguments are nearly identical to the arguments made in his response to Defendants' Motion for Summary Judgment, and both documents contain many of the same exhibits.  (*See id.* and Pl.'s Resp.)  For that reason, the court addresses both motions collectively.

### A.      *Personal Participation*

Defendants argue that summary judgment should be granted in their favor because Defendants did not personal participate in the alleged constitutional violations.  (*Id.* at 11–14.)  Personal participation is an essential allegation in a § 1983 civil rights action.  *Bennett v. Passic*, 545 F.2d 1260, 1262-63 (10th Cir. 1976).  To establish personal liability, a plaintiff must show that the official caused the deprivation of a federal right.  *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).  There must be an affirmative link between the alleged constitutional violation and each defendant's participation, control or direction, or failure to supervise.  *See Butler v. City of Norman*, 992 F.2d 1053, 1055 (10th Cir. 1993).  Morever, it is well established that a defendant

---

properly dismissed as moot.

may not be held liable for constitutional violations merely because he or she holds a supervisory position. *Pembaur v. City of Cincinnati,* 475 U.S. 469, 479 (1986); *Mitchell v. Maynard*, 80 F.3d 1433, 1441 (10th Cir. 1996). "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 129 S. Ct. at 1948.

### i. *Defendant Vigil*

Plaintiff alleges in his Amended Complaint that Defendant Vigil, who Plaintiff alleges is in charge of offender placement, was made aware of his "custody issues: by (1) the district attorney's office, (2) the court's recommendation to place Plaintiff in an out-of-state facility, (3) letters from law enforcement, and (4) telephone calls from Plaintiff's parole officer. (Am. Compl. at 6.) Plaintiff states that Defendant Vigil, despite being aware of the danger associated with housing him with GKI gang members, sent Plaintiff to BVCF, which is known for its violence and gang activity. (*Id.*) Plaintiff alleges Defendant Vigil "failed to fully investigate the situation of how serious [Plaintiff's] custody issues were from the G.K.I. members" and "failed to respond to information about a danger to [Plaintiff]." (*Id.*)

Defendants argue that Plaintiff cannot show that Defendant Vigil had any knowledge or received any letter from Plaintiff or from any law enforcement agencies prior to the assault on August 14, 2006. (Defs.' Mot. at 12.) In his Declaration[4], Defendant Vigil states he was Case

---

[4] Title "28 U.S.C. § 1746 provides that where any rule, regulation, order, etc. requires any matter to be supported by a sworn declaration . . . an unsworn declaration, certificate, verification or statement in writing, subscribed as true under penalty of perjury, in statutory form, may support the matter asserted." *Henderson v. Interchem Coal Co., Inc.*, 41 F 3d 567,

Manager II, working out of Offender Services at CDOC Headquarters, responsible for the classification of high security and administrative segregated inmates and Security Threat Groups. (*Id.*, Ex. D [Decl. of Leonard Vigil], ¶ 2.)  Defendant Vigil states that "[p]rior to January 30, 2008, [he] did not receive any correspondence from [Plaintiff], nor did [he] ever have any contact with other law enforcement agencies regarding the circumstances surrounding [Plaintiff] and his custody issues." (*Id.*, ¶ 6.)  Defendant Vigil contends that the first correspondence he received from Plaintiff was a letter dated January 30, 2008, which addressed Plaintiff's request to be considered for an interstate transfer. (*Id.*, ¶ 7.)  Defendant Vigil states he received two more letters from Plaintiff, dated April 8, 2008 and February 25, 2009, addressing Plaintiff's interstate transfer request. (*Id.*)

In response, Plaintiff argues that Defendant Vigil "indeed had knowledge befor [sic] [January 30, 2008] because he answered a grievance that addressed [Plaintiff's] custody issues and why letters he had wrote [sic] to offenders services were never answered." (Pl.'s Resp. at 20.)  However, the grievance response is dated July 11, 2007, and does not indicate that Defendant Vigil had any knowledge or involvement in Plaintiff's transfer to BVCF on August 8, 2006. (*See* Pl's Mot. Summ. J. at 30.)  To the extent Plaintiff alleges that Defendant Vigil became aware of constitutional violations against him through his administrative filings Defendant Vigil cannot be held liable for actions that occurred prior to his knowledge of such alleged actions. *See McKee v. Heggy*, 703 F.2d 479, 483 (10th Cir. 1983).

---

570 n.1 (10th Cir. 1994).

In the grievance, Plaintiff questions why "Darayle Vigil" has not tried to contact Plaintiff or his case manager to discuss his custody issues. (*Id.*) Defendant Vigil states in his Declaration, and also testified in the hearing regarding Plaintiff's motion for preliminary injunction, that Plaintiff "may [be] confusing me with my supervisor, Daryl Vigil." (Defs.' Mot, Ex. D, ¶ 7.) Plaintiff concedes Defendant Vigil had no contact with Plaintiff in August 2006. (Pl.'s Resp. at 5, ¶ 12.) However, Plaintiff has submitted the declarations of his mother, Laura Aranda, and his grandmother, Dorothy Rivera.[5] Laura Aranda states that Plaintiff asked her to call Leonard Vigil to advise him Plaintiff was not safe in BVCF and that Plaintiff was worried about GKI members who were going to "get him." (Doc. No. 125 at 7.) Ms. Aranda avers that on August 8, 2006, Plaintiff gave her Leonard Vigil's telephone number. (*Id.*) Ms. Aranda states she called Leonard Vigil on August 9, 2006, between 8:30 a.m. and 9:00 a.m., and that Mr. Vigil "told me he would look into it and that my sons [sic] situation is being look [sic] at he would not give me <u>no</u> other information into my sons [sic] situation or what they were planning on doing with my son." (*Id.* at 8 [emphasis in original].) Dorothy Rivera states that Laura Aranda was living with her on August 8, 2006, that Ms. Rivera was on another telephone extension in her house when Plaintiff gave Ms. Aranda Leonard Vigil's telephone number, and that she heard Ms. Aranda place the call to Leonard Vigil. (*Id.* at 3.) As such, though there is a possibility Plaintiff may be mistaken about the true identity of Defendant Vigil, Ms. Aranda's

---

[5] Ms. Rivera's declaration, clearly handwritten by Plaintiff but signed by Ms. Rivera, misspells her name as "Dorthy Rivera." (*See* Dcoc. No. 125.) However, it appears from her signature that Ms. Rivera's first name is properly spelled "Dorothy." (*Id.* at 4.)

and Ms. Rivera's declarations raise genuine issues of material fact which preclude granting summary judgment in favor of Leonard Vigil on the basis of lack of personal participation.

### ii.    *Defendants Anderson and McCormac*

Plaintiff's Amended Complaint alleges Plaintiff spoke directly to Defendant Anderson on August 8, 2006, "and explained [his] situation." (Am. Compl. at 6.) Plaintiff further alleges Defendant Anderson talked to Defendant McCormac, and both defendants decided Plaintiff should go through the A/O Unit before being allowed into the general population unit. (*Id.*) Plaintiff asserts he told the defendants that he could not go into the general population or A/O because each area housed GKI members, but Plaintiff was told he had to go into A/O because there was noone on Plaintiff's separation list housed there who would be a threat to Plaintiff. (*Id.* at 9.) Plaintiff states Defendants Anderson and McCormac "were very aware of the situation and [k]new the circumstance was made clear that an assault was imminent" but that they failed to take steps to prevent it. (*Id.* at 7.)

### a.    *Defendant Anderson*

According to his Affidavit, Defendant Anderson was a sergeant in charge of the Receiving Unit at BVCF during the time period at issue in Plaintiff's Amended Complaint. (Defs.' Mot. Summ. J., Ex. C [Aff. of Peter Anderson], ¶ 2.) As part of his job duties and responsibilities, Defendant Anderson verified and processed offenders in and out of BVCF. (*Id.,* ¶ 3.) The Receiving Unit processed, on average, 200 offenders per week. (*Id.,* ¶ 4.) Upon the offenders' entry in the Receiving Unit, offenders received an initial presentation regarding the specific facility rules. (*Id.,* ¶ 6.) After this presentation, the offenders would meet individually

on a one-on-one basis with the intake case managers, medical staff, and property sergeants. (*Id.*, ¶ 7.) Once this was completed, the offenders were transported to the A/O unit for further processing. (*Id.*, ¶ 9.) This initial process lasted between three and four hours. (*Id.*, ¶ 5.) Defendant Anderson states that when the offenders were transported to the A/O unit, he did not have any further involvement for the purpose of the offenders' initial processing into the facility. (*Id.*, ¶ 10.) If an offender were to notify Defendant Anderson of having any custody or security issues, it was Defendant Anderson's standard practice to direct the matter to the intelligence officer, if available, or the intake case managers, if the intelligence officer was not available. (*Id.*, ¶ 12.) Defendant Anderson avers he did not have access to the DCIS where information regarding custody issues was stored, nor did he have the authority to remove an offender from population. (*Id.*, ¶ 13.)

Plaintiff contends that Defendant Anderson was aware of his custody issues because of "all the documents that were in [his] file about [his] custody issues." (*Id.* at 22.) Plaintiff asserts that Defendant Anderson "had a right to document everything as required" and that Defendant Anderson's failure to document information Plaintiff gave him regarding his custody issues "shows an affirmative link" between Defendant Anderson and the alleged constitutional violations. (*Id.*) Plaintiff also alleges that Defendant Anderson "had the chance to contact lower North and inform staff down there, there was an inmate coming with custody issues and that he had issues with members from the G.K.I" but that Defendant Anderson failed to do so. (*Id.*) Plaintiff further contends that Defendant Anderson failed to relay to Defendant McCormac the

name of at least one of the GKI members housed at BVCF with whom Plaintiff knew there would be custody issues.  (*Id.* at 8, ¶ 29.)

To the extent Plaintiff asserts that Defendant Anderson violated CDOC policy by failing to document Plaintiff's custody issues, a violation of a prison regulation is insufficient to state a constitutional claim under § 1983.  *See e.g. Davis v. Scherer*, 468 U.S. 183, 194 (1984) ("[o]fficials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision").  *See also Hovater v. Robinson*, 1 F. 3d 1063, 1068 n.4 (10th Cir. 1993) ("failure to adhere to administrative regulations does not equate to a constitutional violation"); *Gaines v. Stenseng*, 292 F.3d 1222, 1225 (10th Cir. 2002) ("[t]o the extent [plaintiff] seeks relief for alleged violations of state statutes and prison regulations, . . . he has stated no cognizable claim under § 1983") (citations omitted).

Moreover, in his Response, Plaintiff concedes that Defendant Anderson did not directly handle offenders that claimed to have custody issues and that Defendant Anderson's contact was limited.  (*See* Pl.'s Resp. at 21.)  It is undisputed that Defendant Anderson did not, as the BVCF intake sergeant, directly handle offenders who claimed to have custody issues.  If an offender were to notify Defendant Anderson of having any custody or security issues, it was Defendant Anderson's standard practice to direct the matter to the intelligence officer, if available, or the intake case managers, if the intelligence officer was not available.  (Defs.' Mot. Summ. J., Ex. C ¶ 12.)  It is undisputed that Defendant Anderson did not have access to the DCIS where such information was stored.  (*Id.*, ¶ 13.)  According to the undisputed evidence, it is not Defendant

Anderson's job duty to review documents that come into BCVF to determine which inmates have custody issues, as the placement of offenders is done by offender services. (Pl.'s Resp. at 51 [Defendant Anderson's Resp. to Pl.'s Dep. by Written Question], Resp. to Q. 20.) Finally, it is undisputed that Defendant Anderson did not have the authority to remove an offender from population. (*Id.*)

It is Plaintiff's burden to present affirmative evidence to defeat a properly supported motion for summary judgment. *Anderson*, 477 U.S. at 257. Plaintiff has failed to provide evidence—other than the bare assertions in the Complaint—supporting his position that Defendant Anderson acted in a manner that deprived Plaintiff of his constitutional rights. Plaintiff's bare allegations are insufficient to overcome a motion for summary judgment. *See Sullivan v. Scoular Grain Co. of Utah*, 930 F.2d 798, 800 (10th Cir.1991) ("A nonmoving party cannot survive a motion for summary judgment based on bare allegations in the pleadings without supporting evidence."). As Plaintiff has failed to present evidence showing Defendant Anderson personally participated in any of the acts forming the basis of his claims, it is recommended that summary judgment be granted in favor of Defendant Anderson.

### b.    *Defendant McCormac*

At the time of the incident in question, Defendant McCormac was the Intelligence Officer and Security Threat Group ("STG") Coordinator at the BVCF. (Defs.' Mot. Summ. J., Ex. A [Aff. of Mick McCormac], ¶ 2.) His job duties included, *inter alia*, gathering intelligence of STG activity, monitoring and tracking STG activity. (*Id.*, ¶ 3.) Defendant McCormack states that upon arrival to BVCF, Plaintiff was processed through the Receiving Unit, where he met

with Ms. Ozberg, the intake case manager.  (*Id.*, ¶¶ 5–6.)  According to Defendant McCormac, Plaintiff was transported to the A/O Unit, and Ms. Ozberg notified Defendant McCormac of Plaintiff's custody concerns.  (*Id.*, ¶¶ 6–7, 9.)  Defendant McCormac avers he has no knowledge of Plaintiff providing specifics as to his custody concerns, such as the names of those with whom he may have problems or why the problems exist.  (*Id.*, ¶¶ 9–10.)

In the Declaration of Laura Aranda submitted as a part of Plaintiff's response, Ms. Aranda asserts she spoke to Defendant McCormac to "explain[ ] the whole situation about [her] son's situation and provide[ ] him with phone numbers to call the law-enforcement people [her] son was still talking to and aware of his situation."  (Doc. No. 125 at 8, ¶ 8.)  Ms. Aranda states she advised Defendant McCormac that Plaintiff was not safe being housed in a unit with GKI members, and that Plaintiff had been moved into a cell with a GKI member.  (*Id.*)

The court finds that Plaintiff has sufficiently raised disputes about Defendant McCormac's participation in the conduct giving rise to his Eighth Amendment claim.

### iii.    *Defendant Strode*

Plaintiff asserts he personally told Defendant Strode that he had issues with all GKI members.  (Am. Compl. at 7.)  Plaintiff alleges Defendant Strode knew Plaintiff from Limon Correctional Facility and knew Plaintiff "had issues in Limon in 2001 with members of G.K.I. and was moved from Limon in 2001 cause [sic] of custody issues and threats made by the G.K.I. members."  (*Id.*)  Plaintiff states Defendant Strode asked Plaintiff if he was going to be all right in A/O because there were a few GKI members there.  (*Id.*)  Plaintiff contends he told Defendant Strode on August 10, 2006, that he did not feel safe and that Defendants Anderson and

McCormac knew of the issues.  (*Id.*)  Plaintiff alleges, "[A]t that point, Lt. Strode moved [Plaintiff] . . . to be housed with another G.K.I. member."  (*Id.*)  Plaintiff contends that Defendant Strode, who knew of Plaintiff's history with GKI gang members, was careless to move him to a cell with a GKI member.  (*Id.* at 8.)

According to his Affidavit, Defendant Strode was a lieutenant at BVCF during the time period at issue in Plaintiff's Amended Complaint.  (Defs.' Mot. Summ. J., Ex. B [Aff. of Kip Strode], ¶ 2.)  Defendant Strode was responsible for supervision and oversight of the North, Lower North, and Administrative Segregation housing units, and his job duties included employee scheduling, supervisory evaluations, and inner facility movement.  (*Id.*, ¶ 3.) Defendant Strode states that he saw Plaintiff shortly after he was transferred to BVCF, and that he recognized Plaintiff from their previous interactions while Defendant Strode was employed at the Limon Correctional Facility.  (*Id.*, ¶ 6.)  Defendant Strode contends he was not involved with Plaintiff's transfer to the A/O Unit, nor did he have any knowledge of Plaintiff's placement in the same cell as Perea.  (*Id.*, ¶¶ 7, 9.)  However, Defendant Strode concedes that after Plaintiff was placed in the same cell with Perea, he saw both offenders coming out of their cell. Defendant Strode states that at his next opportunity to talk to Plaintiff, he asked Plaintiff if he thought he was going to be okay in that particular cell and Plaintiff stated he felt he would be safe.  (*Id.*, ¶ 10.)  Plaintiff asserts in his response that he never spoke to Defendant Strode at any time after he was moved into the cell with Perea.  (Pl.'s Resp. at 13, ¶ 48.)

Ms. Laura Aranda states in her declaration that Plaintiff called her on August 17, 2006, and told her that he had been assaulted.  (Doc. No. 125 at 8, ¶ 9.)  Ms. Aranda avers further that

Plaintiff told her that "a Lt. Strode had knew my son's situation [sic] with the G.K.I. gang from another facility and that this c/o had moved him into a cell with a G.K.I. member . . . ." (*Id.*)

The court finds that Plaintiff has provided sufficient evidence of Defendant Strode's personal participation in the conduct giving rise to Plaintiff's Eighth Amendment claim to defeat summary judgment as to Defendant Strode. As the court has determined genuine issues of material fact exist as to the personal participation of Defendants Vigil, McCormac, and Strode, the court recommends their motion for summary judgment on this basis be denied. The court next addresses Plaintiff's Eighth Amendment claim on the merits.

### B.     *Eighth Amendment Claim for Failure to Protect*

The Eighth Amendment imposes on prison officials a duty to protect prisoners from violence at the hands of other inmates. *See Ramos v. Lamm*, 639 F.2d 559 (10th Cir. 1980). Prison officials are not, however, expected to prevent all inmate-on-inmate violence. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Berry v. City of Muskogee*, 900 F.2d 1489, 1494–95 (10th Cir. 1990). The failure of a prison official to protect an inmate from attacks by other inmates rises to the level of an Eighth Amendment violation only if the evidence shows the defendants acted with "wanton or obdurate disregard for or deliberate indifference to" the protection of prisoners' lives. *Harris v. Maynard*, 843 F.2d 414, 416 (10th Cir. 1988); *Northington v. Jackson*, 973 F.2d 1518, 1525 (10th Cir. 1992). The Supreme Court has expressly rejected the suggestion that a prison official violates the Eighth Amendment when he might have known or should have known of a risk of harm. *See Farmer*, 511 U.S. at 837–38. *See also Gonzales v. Martinez*, 403 F.3d 1179, 1186 (10th Cir. 2005).

The test for deliberate indifference claims under the Eighth Amendment is well established in the Tenth Circuit and has "both an objective and a subjective component." *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000). The objective component of the test is met if the harm suffered is "sufficiently serious" to implicate the Cruel and Unusual Punishment Clause. 511 U.S. at 834. In cases alleging the failure to prevent harm, this means that the prisoner must show that the conditions of his incarceration present an objective "substantial risk of serious harm." *Id.*

The subjective component "is met if a prison official 'knows of and disregards an excessive risk to inmate health or safety.'" *Sealock*, 218 F.3d at 1209 (quoting *Farmer*, 511 U.S. at 837). An official "must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. This knowledge may be proved "in the usual ways, including inference from circumstantial evidence, and a fact-finder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* at 842 (citation omitted). The Supreme Court has found:

> [I]f an Eighth Amendment plaintiff presents evidence showing that a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk.

*Id.* at 842–43 (quotations omitted).

Also, regarding the risk of assault, the prison official need not be aware of the risk with

respect to

> the specific [individual] who eventually committed the assault . . . . [I]t does not
> matter, whether the risk comes from a single source or multiple sources, any more
> than it matters whether a prisoner faces an excessive risk of attack for reasons
> personal to him or because all prisoners in his situation face such a risk.

*Id.* at 843. As such, prison officials cannot escape liability merely by claiming that they "did not

know that the complainant was especially likely to be assaulted by the specific prisoner who

eventually committed the assault." *Id.* at 843.

### i. *Seriousness of Harm*

Defendants do not address the objective component of Plaintiff's claim. According to his

amended complaint, Plaintiff was assaulted by his cellmate and suffered injuries requiring

medical attention. The medical records attached to Plaintiff's original complaint show that

Plaintiff suffered injuries to his face and head as the result of an assault. (Doc. No. 3 at 26–27,

36.) Moreover, this court already determined that Plaintiff's injuries are "plausibly 'sufficiently

serious' to constitute a deprivation of constitutional dimension," *Self v. Crum*, 439 F.3d 1227,

1230 (10th Cir. 2006), and to meet the purpose of limiting claims "to significant, as opposed to

trivial, suffering." *Mata v. Saiz*, 427 F.3d 745, 753 (10th Cir. 2005). *See* Doc. No. 48 at 7.

Defendants, instead of focusing on the objective prong, argue that Plaintiff has not satisfied the

subjective prong.

## ii. *Knowledge of Risk*

Whether Plaintiff has met the subjective component of his Eighth Amendment claim is a closer question. In *Howard v. Waide*, 534 F.3d 1227 (10th Cir. 2008), the Tenth Circuit addressed whether a plaintiff prisoner had met the subjective prong required to assert a deliberate indifference claim. The facts in *Howard* are similar to this case. Mr. Howard was an openly gay man and slight of build—traits from which the Tenth Circuit found "a jury could conclude that [the defendants] knew [the plaintiff] was vulnerable to assault." *Id.* at 1238. Mr. Howard alleged that the "2-11 Crew was a well-known and notorious prison gang and that defendants were subjectively aware of the general dangers the group presented, based on their knowledge of past incidents of 'bodily harm, including alleged murder' by 2-11 Crew members in Colorado prisons." *Id.* There was evidence in the record that the CDOC had deemed the 2-11 Crew an "STG," or security threat group. *Id.* The Tenth Circuit found that, standing alone, this circumstantial evidence would not necessarily be sufficient to meet the plaintiff's burden. *Id.* However, the evidence would deprive the defendants of judgment as a matter of law on the issue of subjective knowledge. *Id.*

In this case, Plaintiff has presented similar circumstantial evidence that he was vulnerable to assault. The CDOC chronological record up to the date of Plaintiff's attack is replete with references to Plaintiff's custody issues, the fact that Plaintiff was a GKI member, that Plaintiff had previously been attacked by GKI members, that a "hit" had been put on him and his family by the GKI, and that the GKI and individuals with whom he had custody issues are STG related.

(Pl.'s Mot. Summ. J. at 25–28, 36–40, 60, 63.)  Just as in *Howard*, this evidence alone bars the defendants from summary judgment relief.

The *Howard* Court next addressed the plaintiff's direct evidence of the defendants' knowledge.  Mr. Howard, in grievances, failed to mention past violence at the hands of gang members.  *Howard*, 524 F.3d at 1238.  However, Mr. Howard alleged that he had described violent experiences to at least one defendant and had identified 2-11 as the prison gang responsible for the violent treatment.  *Id.* at 1238–39.  Mr. Howard also implicated one gang member who was in contact with individuals at his current correctional facility.  *Id.* at 1239.  The Tenth Circuit found that this evidence supported a finding that the defendant was subjectively aware of the past violence of the 2-11 gang and the possibility of future violence.  *Id.*  Similarly, Plaintiff here alleges either he, his mother, or various law enforcement sources described his custody issues and past incidents involving the GKI gang to the defendants.  As in *Howard*, the court finds this evidence supports a finding that the defendants were subjectively aware of Plaintiff's past custody issues involving the GKI gang and possibility of future violence against him by the GKI gang.  As such, the court finds Plaintiff has produced sufficient evidence to defeat summary judgment regarding the defendants' subjective knowledge.  The court next addresses whether the defendants "responded reasonably to the risk, even if the harm ultimately was not averted."  *Farmer*, 511 U.S. at 844–45.

### iii.    *Reasonable Response*

Regardless of how prison officials become subjectively aware of a substantial risk of serious harm to an inmate, the Eighth Amendment requires them to respond reasonably.

*Howard*, 524 F.3d at 1237 (10th Cir. 2008). "Because the Eighth Amendment requires only 'reasonable safety,' prison officials who 'actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted.'" *Id.* at 1239 (quoting 511 U.S. at 844–45.) Under this standard, "[a]n official responds to a known risk in an objectively unreasonable manner if he knew of ways to reduce the harm but knowingly or recklessly declined to act." *Id.* at 1239–40 (quoting *Rodriguez v. Sec'y for Dep't of Corrs.*, 508 F.3d 611, 620 (11th Cir.2007)). A court, in determining whether prison officials acted reasonably, should consider what actions they took, if any, as well as available alternatives that might have been known to them. *Id.* at 1240 (citing *Tafoya v. Salazar*, 516 F.3d 912, 918 (10th Cir. 2008; *Perkins v. Kan. Dep't of Corrs.*, 165 F.3d 803, 811 (10th Cir. 1999)).

In *Howard*, the plaintiff identified a group of prisoners who were a threat to his safety, but failed or refused to identify specific individuals who had approached him in the prison yard or other specific members of the 2-11 Crew. *Id.* at 1240. The Circuit stated that the "Eighth Amendment imposes no [ ] requirement" that a prisoner identify a specific threat to his safety. *Id.* (quoting *Farmer*, 511 U.S. at 849 n.10). The Circuit reasoned that "[t]his is not a situation where there is a complete lack of evidence suggesting that prison officials were aware of the gang, or any of its members." *Id.* The Circuit noted that Mr. Howard's intake case manager warned Mr. Howard that "2-11 are everywhere and they have a grapevine" and that Mr. Howard alleged that the prison had a full-time intelligence officer who maintained a database concerning known gang affiliation. *Id.*

24

Defendant McCormac argues that Plaintiff failed to provide specific information as to his custody issues and concerns. (Defs.' Mot. Summ. J., Ex. A, ¶ 9.) Defendant McCormac states that the Department of Corrections Information System ("DCIS"), the database that is updated and maintained by CDOC staff, did not show any individuals on Plaintiff's separation list who were housed at BVCF. (*Id.*, ¶¶ 10, 12.) Defendant McCormac states he instructed Ms. Ozberg to ask Plaintiff to complete a Custody Issue Statement to provide additional information about any custody issues he may have, but Plaintiff refused to complete the Statement. (*Id.*, ¶¶ 13–14.) Defendant McCormac states Plaintiff also refused to provide a verbal statement, but Plaintiff did mention to Ms. Ozberg that he had provided a list of names of individuals with whom he had custody issues to Desmond Manning, the intelligence officer at Denver Reception and Diagnostic Center ("DRDC"). (*Id.*, ¶ 15.) Defendant McCormac states he contacted Officer Manning and eventually obtained information and the list of individuals from her. (*Id.*, ¶¶ 16, 19.) According to Defendant McCormac, the list was different from the DCIS list and contained the names of thirty individuals, two of whom—Joshua Atencio and Edward Munoz—were housed at BVCF. (*Id.*, ¶ 20.) Defendant McCormac states Perea was not listed on either the separation list provided by Officer Manning or the DCIS list. (*Id.*) Defendant McCormac contends that after his attack, Plaintiff was questioned about the incident, and that he again refused to provide specific information. (*Id.*, ¶ 26.)

Plaintiff states he was never given an opportunity to fill out a custody issues statement at BVCF, and that he only spoke to Ms. Ozberg when he was processed through the Receiving Unit and told her that he was concerned about being put into the general population. (Pl.'s Resp. at 9,

¶ 32.)  Plaintiff further contends that he had problems with the entire GKI gang and its members.

(Am. Compl. at 7; Pl.'s Resp. at 7, ¶ 26 and 12, ¶ 41.)  Plaintiff states it would have been

impossible for him to identify every GKI member.  (Pl.'s Resp. at 29.)  Plaintiff also states he

had no chance to notify anyone about Perea once they were put into the same cell because

> I lived with a GKI member I was in a unit with two members that were always
> around me talking to the C/Os who would have confirmed that I was talking and
> to be moved like that all of a sudden after talking to the C/Os would have really
> confirmed I was a snitch . . . .

(*Id.* at 44.)  Plaintiff also states that after his attack, he did not immediately tell the officers what

had happened "so I wasn't snitching."  (*Id.* at 45.)

Just as in *Howard*, the court finds this is not a situation where there is a complete lack of

evidence suggesting that prison officials were aware of the gang, or any of its members.

Testimony given at the preliminary injunction hearing revealed that GKI members are very

numerous within the CDOC.  Additionally, in response to one of Plaintiff's grievances,

Defendant McCormac noted, "I would like to point out that there is probably not a facility in the

CDOC that does not have identified GKI's in their population."  (Doc. No. 114 at 43.)

Plaintiff's "case illustrates one reason not to impose such an absolute prerequisite [that a

prisoner must identify a specific threat to his safety]."  *Howard*, 534 F.3d at 1240 n.8.

If the defendants knew that Plaintiff was being targeted by the GKI gang and that

Plaintiff had been assaulted by the GKI gang in the past, "they had a constitutional duty to

consider all reasonable means of protecting [him]."  534 F.3d at 1240 (citing *Tafoya*, 516 F.3d at

918).  In *Howard*, the Circuit found that the defendants may have had reasonable responses

available to them.  *Howard*, 534 F. 3d at 1240.  Mr. Howard advised prison officials that he could be protected by moving him to more restrictive housing or by transferring him out of state. *Id.*  The Circuit determined that the defendants failed to transfer Mr. Howard within the prison, to consider protective custody, or to transfer him out-of-state.  *Id.* at 1241.  One of the defendants wrote to Mr. Howard that "[w]e cannot keep you away from all 211" and that "[facility placement is classification and cannot be grieved." (*Id.*)  Another defendant allegedly told Mr. Howard that "he would have to learn to live with" the risks to his safety.  (*Id.*)  As such, the Circuit found that the "defendants' failure to attempt the remedies identified by Mr. Howard . . . reveal[ed] that their failure to act may not have been premised on an inability to do so."  The Circuit found that "a jury could reasonably conclude that [the defendants] declined to respond in an objectively reasonable manner."  *Id.*

In this case, Plaintiff sought to "[e]njoin the defendants to take resonable [sic] messures [sic] to ensure [Plaintiff's] safety and not housed with known G.K.I. members", and to "[e]njoin the defendants to transfer the plaintiff out of state to another D.O.C. facility."  (Am. Compl. at 11.)  At the hearing on his motion for preliminary injunction, Plaintiff also suggested that he be put into "permanent party placement" at Centennial Correctional Facility, where he felt he would be safer.  Though Plaintiff was transferred to the Oregon Department of Corrections on March 2, 2010, it appears from the CDOC records submitted with Plaintiff's motion for summary judgment that the first time any attempt to have Plaintiff considered for interstate transfer was on September 5, 2006.  (Doc. 114-1 at 1.)  On the other hand, the record in this case shows that Plaintiff repeatedly asked for an out-of-state transfer, for a transfer to a safer facility, or to be

placed on "removal from population" status before he was attacked at BVCF. Plaintiff was told

at various times that "there is probably not a facility in the CDOC that does not have identified

GKI's in their population" (Doc. No. 114 at 43), that "facility placement is a classification matter

and not grievable" (Doc. No. 3 at 18), and that "until we get word from the courts that they are

done with you, you will not be leaving out of SCCF" (Doc. 114 at 30). Plaintiff also alleges he

was told by the intake case manager that "there's a lot [sic] of inmates with custody issues" and

that he should "deal with it." (Pl.'s Resp. at 28.) The court finds Plaintiff has provided

sufficient evidence that a jury reasonably could conclude that the defendants failed to respond in

an objectively reasonable manner. Plaintiff's allegations create genuine issues of material fact as

to whether defendants responded reasonably, as the Eighth Amendment requires.

### C. *Qualified Immunity*

Defendants nevertheless assert that they are entitled to qualified immunity because

Plaintiff has failed to demonstrate a violation of a constitutional right, and Defendants' actions

did not violate clearly established law. The doctrine of qualified immunity shields government

officials from individual liability for civil damages "insofar as their conduct does not violate

clearly established statutory or constitutional rights of which a reasonable person would have

known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity is "an immunity

from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively

lost if a case is erroneously permitted to go to trial." *Saucier v. Katz*, 533 U.S. 194, 121 (2001).

Because of the underlying purposes of qualified immunity, courts address qualified

immunity questions differently from other summary judgment decisions. *Medina v. Cram*, 252

F.3d 1124, 1128 (10th Cir. 2001).  After a defendant asserts a qualified immunity defense, the

burden shifts to the plaintiff, who must meet a "heavy two-part burden."  *Id.*  Plaintiff first must

establish that the facts, taken in the light most favorable to Plaintiff, show that the officer's

conduct violated a constitutional right.  *Saucier*, 533 U.S. at 201.  If Plaintiff establishes a

violation of a constitutional or statutory right, "the next, sequential step is to ask whether the

right was clearly established."  *Id.*  This determination must be made "in light of the specific

context of the case, not as a broad general proposition."  *Id.*  "[T]he relevant, dispositive inquiry

. . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the

situation he confronted."  *Id.* at 202.  If the plaintiff fails to satisfy either part of this "heavy

two-part burden," the court must grant the defendant qualified immunity and dismiss the

deficient claims.

    In a recent opinion, the United States Supreme Court altered somewhat the analytical

process that may be used when a defendant claims the protection of qualified immunity.

*Pearson v. Callahan*, ___ U.S. ___, 129 S. Ct. 808 (2009).  In *Pearson*, the Supreme Court held

that the sequential two step analysis mandated in *Saucier* should no longer be regarded as

mandatory.  The judges of the district courts and the courts of appeals should be permitted to

exercise their sound discretion in deciding which of the two prongs of the qualified immunity

analysis should be addressed first in light of the circumstances in the particular case at hand.

*Pearson*, ___ U.S. ___, 129 S. Ct. at 818.  The Supreme Court noted, however, that the sequence

set forth in *Saucier* often is the appropriate analytical sequence.  *Id.*

The court has determined Plaintiff has provided evidence that genuine issues as to material facts exist that might lead a reasonable jury to return a verdict for Plaintiff with respect to his Eighth Amendment claim against Defendants McCormac, Strode, and Vigil. Plaintiff must next show that the violated right was "clearly established" at the time of the conduct. *Saucier*, 533 U.S. at 201. For a law to be clearly established, "there must be a Supreme Court or other Tenth Circuit decision on point, or the clearly established weight of authority from other circuits must have found the law to be as the plaintiff maintains." *Moore v. Guthrie*, 438 F.3d 1036, 1042 (10th Cir.2006) (citations omitted).

Under *Howard*, Plaintiff has an unequivocal right to be protected from substantial risks of assault by fellow prisoners in cases where "he has presented evidence, both direct and circumstantial, that prison officials knew he faced an ongoing risk from a prison gang with a substantial presence in the facility, and that [prison officials] had reasonable responses available to them." *Howard*, 534 F.3d at 1442. Defendants may argue that this right was not clearly established until July 2008, and that because Plaintiff was assaulted prior to the Circuit's holding in *Howard*, they are entitled to qualified immunity under the law formerly established by *Farmer* that requires evidence of *actual knowledge* of a threat. 511 U.S. at 837.

However, even under the law formerly established in *Farmer*, Defendants are not entitled to qualified immunity. In the absence of direct and circumstantial evidence, an inmate's failure to identify those inmates from whom he seeks protection makes it extremely difficult—if not impossible—for prison officials to assess the inmate's concern and decide if the concern suffices to invoke the Supreme Court mandate to "'take reasonable measures to guarantee the [inmate's]

safety . . . .'" *Farmer*, 511 U.S. at 832–33 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)).  Thus, as the Circuit stated, "if it were truly impossible for prison officials to protect [plaintiff]—due to his refusal to name gang members or for other reasons—he would have no Eighth Amendment claim."  *Howard*, 534 F.3d at 1242.

Defendants argue that Plaintiff did not provide specifics as to his custody concerns, such as the names of those with whom he may have problems or why the problems exist.  (Defs.' Mot. Summ. J., Ex. A, ¶¶ 9–10.)  However, Plaintiff states he was never given an opportunity to fill out a custody issues statement at BVCF and that he was told he should "deal with" his custody issues.  (Pl.'s Resp. at 9, ¶ 32, and at 28.)  Plaintiff also contends that Defendant McCormac waited until Plaintiff was attacked to call Officer Manning to obtain Plaintiff's separation list.[6] (Pl.'s Resp. at 10, ¶¶ 34–35.)  Therefore, if Plaintiff's allegations are true, the defendants would not have been able to protect Plaintiff from any GKI member—even those previously listed by Plaintiff as inmates from whom he needed protection.  The court finds there is a genuine issue of material fact as to whether Plaintiff failed to identify any inmates from whom he sought protection or whether Defendants failed to act on the information Plaintiff alleges he gave them.  Moreover, the court finds there is a genuine issue of material fact as to whether Defendants made a reasonable attempt to identify "reasonable measures to guarantee [his] safety . . . .'" *Farmer*,

---

[6]On August 10, 2006, Plaintiff was housed with Theodore Perea, the offender who assaulted Plaintiff on August 14, 2006 at approximately 1:30 p.m.  (Defs.' Mot. Summ. J, Ex. A, ¶ 22; Attach. 1.)  On August 14, 2006, at 2:49 p.m., Defendant McCormac received a list of individuals that Plaintiff provided to Officer Manning at DRDC.  (*Id.*, ¶ 19.)  The court agrees that the timing of the receipt of the separation list is suspicious.

511 U.S. at 832–33. Accordingly, Defendants McCormac, Strode, and Vigil are not entitled to qualified immunity.

WHEREFORE, for the foregoing reasons, the court respectfully

**RECOMMENDS** that

1.      Plaintiff's claims for declaratory relief and injunctive relief be dismissed with prejudice as moot;

2.      Plaintiff's official-capacity claims for monetary relief against the defendants be dismissed with prejudice as they are barred by the Eleventh Amendment;

3.      Defendants' "Motion for Summary Judgment" (Doc. No. 107) be GRANTED in part and DENIED in part as follows:

   a.      Summary judgment be granted in favor of Defendant Anderson for failure due to lack of personal participation;

   b.      Summary judgment be denied as to Defendants Vigil, McCormac, and Strode for claims for monetary relief against them in their individual capacities;

4.      Plaintiff's "Dispositive Motion" (Doc. No. 114) be DENIED; and

5.      This case be set for further proceedings on Plaintiff's Eighth Amendment claims against Defendants Vigil, McCormac, and Strode for claims for monetary relief against them in their individual capacities.

## ADVISEMENT TO THE PARTIES

Within fourteen days after service of a copy of the Recommendation, any party may serve and file written objections to the Magistrate Judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *In re Griego*, 64 F.3d 580, 583 (10th Cir. 1995). A general objection that does not put the district court on notice of the basis for the objection will not preserve the objection for *de novo* review. "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review." *United States v. One Parcel of Real Prop. Known As 2121 East 30th Street, Tulsa, Okla.*, 73 F.3d 1057, 1060 (10th Cir. 1996). Failure to make timely objections may bar *de novo* review by the district judge of the magistrate judge's proposed findings and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings and recommendations of the magistrate judge. *See Vega v. Suthers*, 195 F.3d 573, 579-80 (10th Cir. 1999) (a district court's decision to review a magistrate judge's recommendation *de novo* despite the lack of an objection does not preclude application of the "firm waiver rule"); *One Parcel of Real Prop.*, 73 F.3d at 1059-60 (a party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for *de novo* review by the district court or for appellate review); *Int'l Surplus Lines Ins. Co. v. Wyo. Coal Ref. Sys., Inc.*, 52 F.3d 901, 904 (10th Cir. 1995) (by failing to object to certain portions of the magistrate judge's order, cross-claimant had waived its right to appeal those portions of the ruling); *Ayala v. United States*, 980 F.2d 1342,

1352 (10th Cir. 1992) (by their failure to file objections, plaintiffs waived their right to appeal the magistrate judge's ruling); *but see, Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require review).

Dated this 18th day of August, 2010.

BY THE COURT:

Kathleen M. Tafoya
United States Magistrate Judge